BANK, (SAMPLES v.) See Case No. 12,278.

---

## Case No. 843.

### BANK v. SHAW et al.

[2 Wkly. Notes Cas. 542; 1 Law & Eq. Rep. 591.]

Circuit Court, E. D. Pennsylvania. April 6–12, 1876.[1]

NEGOTIABLE INSTRUMENTS—BILL OF LADING—PENNSYLVANIA STATUTES.

[1. Act Pa. Sept. 24, 1866, (1 P. L. 1363,) making bills of lading negotiable, does not enable a wrongful taker of such a bill to pass to an innocent purchaser any better title than he himself has. But if the rightful owner has negligently parted with the bill of lading the wrongful holder may pass a perfect title to an innocent purchaser, who has no notice of such negligence.]

[See note at end of case.]

[See Dows v. Bank, 91 U. S. 618; Pollard v. Vinton, 105 U. S. 7; Henry v. Warehouse Co., 81 Pa. St. 76; Barker v. Dinsmore. 22 P. F. Smith, (72 Pa. St.) 427; Transportation Co. v. Steele, 20 P. F.

---

[1] [Affirmed in 101 U. S. 557.]

Smith. (70 Pa. St.) 188; Decan v. Shipper, 11 Casey, (35 Pa. St.) 239.]

[2. Purchasers of a bill of lading, who have any reason to believe that the sellers held it as security for an outstanding draft, take no better title than such sellers had. And the fact that the purchaser telegraphed the carrier, to learn whether the shipment represented by the bill had actually been made, is competent evidence on the question of the indorsee's belief.]

[See note at end of case.]

[At law. Action of replevin by the Merchants' National Bank of St. Louis against Shaw & Esrey for the recovery of certain cotton which had come into defendants' possession by an alleged wrongful transfer of the bill of lading. Judgment was heretofore given for plaintiffs, but a new trial was granted, on the authority of National Bank of Commerce v. Merchants' Nat. Bank, 91 U. S. 92, on the ground that the evidence had not been sufficiently clear that the bill of lading had been held as security for the payment of a certain draft. Verdict and judgment are now given for plaintiffs.

[This decision was subsequently affirmed by the supreme court in Shaw v. Railroad Co., 101 U. S. 557. See note at end of case.]

The Merchants' National Bank of St. Louis agreed with Norvell & Co. of that city and Kuhn & Bro. of Philadelphia to make advances on bills of lading for cotton shipped by Norvell & Co. to Kuhn & Bro., and in accordance with this agreement discounted Norvell & Co.'s draft on Kuhn & Bro. for $11,947 payable 20 days after sight. The Merchants' Bank at the same time received the original bill of lading for 170 bales to the order of Norvell & Co. and indorsed in blank by Norvell & Co. The duplicate bill of lading marked "Not negotiable" was forwarded by Norvell & Co. to Kuhn & Bro. as notice of the shipment. The Merchants' Bank forwarded to its correspondent in Philadelphia, the Bank of North America, for collection, the draft, with the bill of lading attached. Kuhn & Bro. accepted both, as the collector supposed, and they were held by the Bank of North America until maturity. The draft was then protested, and it was found that Kuhn & Bro. had substituted the duplicate for the original bill of lading and kept the latter. The officers and servants of the bank testified that this was without their knowledge or consent. Kuhn & Bro., soon after getting possession of the original bill of lading in this manner, got an advance of $8,500 thereon from Miller & Bro., directing them to sell the cotton as soon as possible. It was accordingly sold by sample and for cash to Shaw & Esrey, who did not see the bill of lading or other written evidence of title. The carrier delivered the cotton to Shaw & Esrey under the orders of Miller & Bro. Whereupon the Merchants' National Bank of St. Louis replevied it.

A short time before Kuhn & Bro. wrongfully got possession of the original bill of lad-

ing involved in this case, Miller & Bro. had advanced $6,000 to Kuhn & Bro. on an original bill of lading for 143 bales, drawn and endorsed as this one was. On the next day Kuhn & Bro. took back the bill of lading, giving their check for $6,000 in exchange. Later in the same day Miller & Bro. advanced $7,000 to Kuhn & Bro. on the same bill. On the morning of this day Miller & Bro. saw a notice in a newspaper warning the public that a bill of lading for 143 bales had been stolen. Miller & Bro., before making the second advance of $7,000, learned from the officers of the Farmers' & Mechanics' Bank that the bill had been wrongfully taken from the bank, but the matter had been adjusted and advances could now safely be made on it. The bank officers then informed Miller & Bro. that in case of such a wrongful taking they would have a right to seize the cotton wherever found.

After advancing $8,500 on the bill of lading involved in this suit, Miller & Bro. wired the agent of the carrier at St. Louis and learned that the bill was all right. Miller & Bro. had been in the habit of making advances to Kuhn & Bro. on duplicate bills of lading.

There was no testimony as to the good faith of Shaw & Esrey.

R. N. Willson and George Junkin, for plaintiffs.

W. H. Lex and J. E. Gowen, contra.

Before McKENNAN, Circuit Judge, and CADWALADER, District Judge.

CADWALADER, District Judge, [orally charging the jury.] The effect of these transactions and of the letters and other evidence was that the cotton was appropriated for the security of the bank, not merely until acceptance of the bill in exchange, but until actual payment of it. Such a stipulation is proved, and not disputed. Upon the effect then of what has been stated, the plaintiffs had a special property in the cotton in question for the security not only of the acceptance, but the payment of the bill of exchange. Until, therefore, the plaintiffs voluntarily parted, if they ever did so, with the bill of lading, or bill of exchange, or otherwise lost their title to it, they had a special property in this cotton which authorized them to maintain the present action. As this bill of lading was negotiable, it becomes very important to inquire whether the possession of it was wilfully or negligently parted with by the Bank of North America as agent of the plaintiffs, because if the true owner of property, through himself or his agent, wilfully or negligently allows the muniments of title, especially such a muniment as a bill of lading, to get out of his possession and into circulation, so as to enable a wrong-doer to impose himself upon others as the owner, the true owners of the property may be divested of their title, and the wrong-

doer able to pass to innocent parties a better title than the rightful owner would then have. It, therefore, becomes very important to inquire whether the Bank of North America wilfully or negligently parted with the possession of the original bill of lading, and as that bank was the agent of the plaintiff, and as the means of knowledge were, we think, peculiarly within their reach, reason and common sense would induce us to expect that the proof of the truth as far as it could be ascertained would come from the party who thus had the means of knowledge. Accordingly, the plaintiffs have undertaken to prove how, as far as they were able to show, this bill of lading got out of their possession, and their proof is very simple, and may probably be very satisfactory to you. In the first place they produce the president and cashier, which is proper if it were a mere formality, and it is a proper formality, to say that there was nothing known to them to authorize any departure from the regular rules of business. They had no right to part with it as between them and the plaintiffs, but, lest innocent persons should suffer, the proof is made that they never authorized nor knew anything about it. Then the subordinates who would have knowledge on the subject are produced, and their testimony is to the same effect.

If the plaintiffs or their agents neither wilfully nor negligently parted with this bill of lading, but it was surreptitiously abstracted, the court is of opinion that Kuhn & Bro. could not transfer to Miller a better title than they themselves had. The facts of the particular case are with the jury; the law, as the court is at present advised, I have stated. A bill of lading is, in certain forms of it, negotiable at common law, and, in other forms of it, is negotiable by a law of Pennsylvania passed in 1866. [Act Sept. 24, 1866; 1 P. L. 1363.] Other states have passed laws which are somewhat different. Louisiana and Missouri have passed laws which use words making a bill of lading negotiable in the same way that a bank note or bill of exchange is negotiable. The Pennsylvania law omits those words, and the court is of opinion that their omission is to be considered in the interpretation of the act, and that while a bill of lading is to certain intents negotiable, so as to pass the legal title among parties rightfully concerned in it, and so as to enable a wrong-doer, under circumstances such as I have explained, to impose himself on the world as owner, yet the rule that applies to a bank note, or bill of exchange, or promissory note is not in Pennsylvania the standard by which to determine the present question. If the true owner through any fault, omission of duty, or carelessness of any kind, to say nothing of what is not, of course, a wilful parting, enables a wrongdoer to impose upon the world, then the true owner ought to suffer; but, where the bill of

lading is merely stolen from him, the law does not shift the title through a mere possession of it alone.

The plaintiffs' case thus far, if we are right in the law as we state it, and in this view of the facts, stands on a very simple footing. The defendants of record—Shaw & Esrey—appear to have bought here through a broker the cotton in controversy, from Miller & Bro. Now it does not appear that, when the defendants bought, a bill of lading or any muniment of title or anything of the kind was exhibited to them. They bought on samples, and, while their purchase was an innocent and ordinary one in the market, there was nothing to show title by documents such as a bill of lading or anything else. Their case, therefore, if there was nothing intervening, is simply that of a party who innocently buys what did not belong to the seller, and every man knows that he can get no better title than the seller, so that, as far as the defendants' personal relations to the property in question are concerned, they could acquire no title as against the present plaintiff; but Shaw & Esrey have the full benefit of whatever title Miller & Bro., from whom they bought, may have had. If, therefore, Miller & Bro. had a better right than the plaintiffs, Shaw & Esrey have the benefit of that right, because whatever right Miller & Bro. had, they sold to Shaw & Esrey.

This brings us to inquire as to the title which Miller & Bro. set up. They allege that they have, by reason of what occurred between them and Kuhn & Bro., a better title than the plaintiffs, and they rest this allegation of title upon the possession by Kuhn & Bro. of the original bill of lading, and the exhibition of it to them, and transfer of it to them, as security for an advance of $8,500. The court is of opinion that if there was no wilful or negligent parting with the bill of lading by the true owners of the cotton, Kuhn & Bro. could transfer no better right than they themselves had. If you should find that there was on the part of the plaintiffs or their agents a negligent, not a wilful parting as alleged, but a negligent, parting with the bill of lading, then the title of Miller & Bro. requires consideration under a different light. Then, if there was nothing more in the case, Miller & Bro. would get a better title than the plaintiffs, and hence, it becomes necessary to consider a question which I will state thus: did Miller & Bro. know any fact or facts from which there was reason to believe that the bill of lading in question was held as a security for an outstanding draft? If they did, they were not innocent takers. I do not mean that they were not innocent, as between them and Kuhn & Bro. I do not mean that there was any moral fraud, but I mean innocent as regards a true owner. It is for you to say how far that transaction with the Farmers" & Mechanics' Bank, and another circumstance which I will mention, may rationally have contributed to induce in the mind of a reasonable person a distrust of the honesty of Kuhn & Bro., in respect of such transactions as that of which you find, in the evidence in question, this is a part. But there is another circumstance, which accordingly as you may view the facts, and they are entirely for you, may or may not induce you to believe not merely that Mr. Miller had reason to distrust, but that he actually did distrust Kuhn, in reference to the very shipment in question, because it appears that when he made the advance of $8,500 on the bill of lading here in question, he telegraphed to a person who represented the carriers to know if all was right. Now, as regards the carrier, a carrier could know nothing except the fact whether the cotton was shipped. I do not want to usurp your privilege: it is for you to say whether you so find, but I suggest for your consideration, that there was distrust on the question whether this cotton, any cotton, or the cotton represented by the bill of lading, had been shipped at all. Would Miller have made this inquiry if he had no distrust of Kuhn & Bro.? Those two circumstances, separately or together as you may think right, are for your consideration, and upon them, and upon the whole facts of the case, you will say whether you will find that Miller knew what gave him reason to think that Kuhn's title was not all right. If you do so find, then it would be of no importance whether the Bank of North America was negligent or not, because they do not lose their title as between them and Kuhn, and would only lose it as regards an innocent unsuspecting purchaser. If Miller had reason to believe all was not right, then he took the risk; there was no fraud, but he was not a child under age, and he knew the risk that he ran, if he doubted the title. It did not impute any want of integrity in him. In fact, I do not know how it is with you, but I rather think all of us are very much in the habit of running risks of which we know we take the consequences. We take for granted that checks are not forged, and we do it perhaps with people we know nothing about, and we may think ourselves very foolish if we get into difficulty, but it does not affect our moral standing, and I say, I do not see anything in this case to raise a question affecting Mr. Miller morally, but the question is whether he has not taken a risk on himself, of which he ought to take the consequences.

You will find your verdict generally for plaintiffs or for the defendants.

The court requests the jury before their verdict is recorded to answer specially two questions: (1) Whether there was any negligence of the plaintiffs or their agents in parting with possession of the bill of lading. (2) Whether Miller & Bro. knew any fact or facts from which they had rea-

son to believe the bill of lading was held to secure payment of an outstanding draft.

McKENNAN, Circuit Judge, concurred.

Verdict for plaintiffs. Answer to first question: No. Answer to second question: Yes. Thereupon judgment was entered for plaintiffs.

[NOTE. This judgment was affirmed by the supreme court in Shaw v. Railroad Co., 101 U. S. 557. Mr. Justice Strong, in delivering the opinion, said: "Bills of lading are regarded as so much cotton, grain, iron, or other articles of merchandise. The merchandise is very often sold or pledged by the transfer of the bills which cover it. They are, in commerce, a very different thing from bills of exchange and promissory notes, answering a different purpose and performing different functions. It cannot be, therefore, that the statute which made them negotiable by indorsement and delivery, or negotiable in the same manner as bills of exchange and promissory notes are negotiable, intended to change totally their character, put them in all respects on the footing of instruments which are the representatives of money, and charge the negotiation of them with all the consequences which usually attend or follow the negotiation of bills and notes. Some of these consequences would be very strange, if not impossible, such as the liability of indorsers, the duty of demand ad diem, notice of nondelivery by the carrier, etc., or the loss of the owner's property by the fraudulent assignment of a thief. If these were intended, surely the statute would have said something more than merely make them negotiable by indorsement. No statute is to be construed as altering the common law, further than its words import. It is not to be construed as making any innovation upon the common law which it does not fairly express. Especially is so great an innovation as would be placing bills of lading on the same footing in all respects with bills of exchange not to be inferred from words that can be fully satisfied without it. The law has most carefully protected the ownership of personal property, other than money, against misappropriation by others than the owner, even when it is out of his possession. This protection would be largely withdrawn if the misappropriation of its symbol or representative could avail to defeat the ownership, even when the person who claims under a misappropriation had reason to believe that the person from whom he took the property had no right to it. We think, therefore, that the rule asserted in Goodman v. Harvey, 4 Adol. & E. 870; Goodman v. Simonds, 20 How. (61 U. S.) 343; Murray v. Lardner, 2 Wall. (69 U. S.) 110,—and in Phelan v. Moss, 67 Pa. St. 59, is not applicable to a stolen bill of lading. At least, the purchaser of such a bill, with reason to believe that his vendor was not the owner of the bill, or that it was held to secure the payment of an outstanding draft, is not a bona fide purchaser, and he is not entitled to hold the merchandise covered by the bill against its true owner. In the present case there was more than mere negligence on the part of Miller & Bro.; more than mere reason for suspicion. There was reason to believe Kuhn & Bro. had no right to negotiate the bill. This falls very little, if any, short of knowledge. It may fairly be assumed that one who has reason to believe a fact exists knows 'it exists; certainly, if he be a reasonable being.'"]